1

2

3

4

5

6  IN THE UNITED STATES DISTRICT COURT

7  FOR THE DISTRICT OF ARIZONA

8

9  Brenda Porter,                                    )         No. CV 04-00537-TUC-JMR(CRP)

10        Plaintiff,                                  )         **REPORT AND RECOMMENDATION**

11  vs.                                               )

12                                                    )

    Jo Anne B. Barnhart,                              )

13                                                    )

        Defendant.                                    )

14                                                    )

15  _____ )

16

17        Plaintiff Brenda Porter has filed the instant action seeking review of the final decision

18  of the Commissioner of Social Security pursuant to 42 U.S.C. §405(g). The case has been

19  referred to the United States Magistrate Judge pursuant to the Rules of Practice of this Court.

20        Pending before the Court are Plaintiff's Motion for Summary Judgment (Docket 13)

21  and Defendant's Cross-Motion for Summary Judgment (Docket 16).

22        The Magistrate Judge recommends that the District Court, after its independent

23  review, grant the Plaintiff's motion in part and deny the Defendant's cross-motion.

24  PROCEDURAL HISTORY

25        Plaintiff filed an application for supplemental social security income (SSI) and for

26  disability insurance benefits (DIB), alleging an onset date of December 31, 1999. (TR. 607,

27  622, 244-46). In her application, Plaintiff alleged that she was disabled due to arthritis in her

28

1  knees and hips, hypothyroidism, depression, asthma, sleep apnea, fibromyalgia, obesity, and
2  bipolar disorder. (TR. 257, 622, 326).

3       The Social Security Administration (SSA) denied her application initially and upon
4  reconsideration. (TR. 611-14, 616-19, 198-201, 207-09). Plaintiff requested review and on
5  March 5, 2004, appeared with counsel at a hearing before Administrative Law Judge (ALJ)
6  Frederick J. Graf. (210-13, 620-39). The ALJ found that Plaintiff was not disabled. (TR.15-
7  28). Plaintiff appealed the ALJ's decision, but the Appeals Council denied review making
8  the decision of the ALJ the final decision of the Commissioner. (TR. 10-12); 20 C.F.R. §
9  404.981. Plaintiff then filed the instant complaint in U.S. District Court appealing the
10 Commissioner's final decision. She filed a motion for summary judgment on April 22, 2005.
11 (Docket 13). Defendant filed a response and cross-motion for summary judgment on June
12 22, 2005. (Docket 16). Plaintiff filed a response to Defendant's cross-motion on August 5,
13 2005. (Docket 21).

14 THE RECORD ON APPEAL

15       Plaintiff's Statements on the Record

16       Plaintiff was born June 24, 1963 and at the time of hearing before the ALJ, was 40
17 years old. (TR. 625). Plaintiff was never married and living with her mother, who was 62
18 years old at the time of hearing, and Plaintiff's two daughters, who were twelve and eight
19 years old. (TR. 626). Plaintiff moved to Arizona in 2003. (TR. 627-28). Prior to that she had
20 lived in Ohio. (TR. 628). She moved to Arizona because of her health problems and her
21 mother's health problems. (*Id.*). Plaintiff testified that, "[a] lot of our doctors back home
22 seem to think the hot, dry weather back here would help the arthritis and fibromyalgia..."
23 (*Id.*). Plaintiff completed high school. (TR. 626).

24       Plaintiff testified that she had problems with sleep apnea. (TR. 628-29). She testified
25 that she had tried the CPAP[1], which was supposed to help with the sleep apnea. (TR. 629).

26

27       [1]Continuous positive airway pressure mask (Defendant's Statement of Facts, Docket
28 17, p.6; TR. 23).

However, she testified that she "couldn't wear it through the night. I always had it off before morning. And so...I still snore and stop breathing during the night...and I wake up a lot during the nights." (*Id.*).  Plaintiff testified that since her move to Arizona in 2003 she had been physically and mentally unable to work. (TR. 631).  She testified that this was due to "the arthritis and fibromyalgia and the joint pain, muscle pain and things that's hard for me to be able to, like, stand for so long or sit - - and then more than anything, it's the roller coaster with the bipolar and the depression." (*Id.*)  Plaintiff explained that her bipolar disorder made her feel unmotivated, unable to concentrate, and made it difficult to handle stress. (TR. 633).  She also testified that it made it difficult for her to handle multi-tasking and made her easily distracted. (*Id.*).

Plaintiff testified that she takes a number of medications. (TR. 635, 328).  She takes vicodin for pain. (*Id.*).  She also takes diclonase for pain and arthritis. (*Id.*).  For her depression and mood swings she takes effexor and depakote. (*Id.*).  She takes lavoxyl for her thyroid and also takes ranitidine for stomach upset caused by the other medications. (*Id.*).  Plaintiff reported that her medications cause severe side effects. (TR. 635-36, 328). Those side effects include drowsiness, fatigue, nausea, heartburn, indigestion, dry mouth, nervousness, shakiness, and day and night sweats. (*Id.*).  Plaintiff also testified that she suffers from fatigue. (TR. 636).  "I tire very easily...I believe it's between the arthritis and fibromyalgia and depression, a combination with, the low thyroid as well causes...fatigue." (*Id.*).

Plaintiff also testified that she has difficulty with household tasks.(TR. 636-37). Plaintiff indicated that she had a difficult time with sweeping and mopping the floors and that her children help her with those tasks because she struggles with them. (TR. 636).  She also testified that she has difficulty doing the laundry.  Plaintiff indicated that she has a hard time completing a chore once she starts it because she becomes physically and mentally "worn out." (TR. 637-38).  Plaintiff testified that she only drives as needed and limits the time that she drives "[b]ecause sitting - - my hip pain and neck and back pain...when you are driving..."

1  (TR. 637).  Plaintiff indicated that there are days when she doesn't even bathe because of her

2  depression.  (*Id.*).  Plaintiff testified that she needed to use a cart and get help from her

3  children when she comes back from the grocery store[2]. (TR. 638).

4      Plaintiff's Work History

5  Plaintiff worked as a child care provider at a day care center from November 2001

6  until December 2001. (TR. 301).  At this job Plaintiff worked four hours a day, five days a

7  week. (TR. 302).   She lifted 20 pounds occasionally and ten pounds frequently.  (*Id.*).

8  Plaintiff helped supervisor the children, fixed their snack, and cleaned up after them. (*Id.*).

9  Her cleaning tasks included sweeping and mopping the floors every night; stacking the

10  children's chairs; and cleaning up the play area. (*Id.*).

11  Plaintiff worked as a telephone operator at an inbound call center in November of

12  2001. (TR. 301).  She worked for six hours a day, four or five days a week. (TR. 303).  At

13  this job, Plaintiff sat at a cubicle and took orders over the phone. (*Id.*).  She frequently lifted

14  objects weighing less than ten pounds. (*Id.*)

15  In May 2001, Plaintiff was employed as a nurse's aide in a nursing home. (TR. 301).

16  She worked for eight hours a day, five days a week. (TR. 304).  Plaintiff worked the night

17  shift where she assisted the patients with bathing, took them to the restroom, kept the beds

18  clean and changed and assisted with feeding of the patients. (*Id.*).  Plaintiff indicated that

19  "this job consisted of lots of things that really hurt my body, lots of bending, stooping,

20  standing, walking...lifting, turning patients..." (*Id.*).  At this job the heaviest weight Plaintiff

21  lifted was 100 pounds or more and she frequently lifted 25 pounds. (*Id.*).

22  From February 2000 until March of 2001, Plaintiff was self-employed as an in-home

23  health care provider. (TR. 301).  Plaintiff worked ten or more hours a day, seven days a

24  week, caring for her terminally ill grandmother. (TR. 305).  She helped her grandmother,

25  _____

26      [2]This testimony was in reference to the lay statement submitted by Plaintiff's mother.
27  (TR. 330-338).  Plaintiff's mother indicated that when Plaintiff returns from the grocery store
    she needs to use a cart or wagon to bring the groceries from the car. (TR. 335).  Plaintiff's
28  mother also indicated that Plaintiff's children help her with this task. (*Id.*).

1  bathe and dress and took her to and from her doctor's appointments. (*Id.*). She also checked

2  her grandmother's blood sugar, administered her insulin shots, and emptied her catheter. (*Id.*).

3  The heaviest weight Plaintiff lifted was 100 pounds or more and she frequently lifted 25

4  pounds. (*Id.*). Plaintiff also worked as a self-employed in-home health care provider from

5  February 1991 until September 1991. (TR. 301).

6  From February 2000 until May 2000, Plaintiff worked as a parts finisher in a factory.

7  (TR. 301). She worked eight to ten hours a day, five or six days a week. (TR. 306). At this

8  job, Plaintiff sat at a work table and used an airgun to finish parts. (*Id.*). She also used a

9  dolly to move crates of parts to a warehouse. (*Id.*). Plaintiff lifted 25 pounds frequently.

10  (*Id.*). The heaviest weight that she lifted was 50 pounds. (*Id.*).

11  From June 1992 until November 1994, Plaintiff was employed as a heavy equipment

12  operator for a construction company. (TR. 301). She worked eight to twelve hours a day,

13  from five to seven days a week. (TR. 307). The heaviest weight Plaintiff lifted at this job

14  was 20 pounds and she frequently lifted ten pounds. (*Id.*).

15  <u>Medical Evidence</u>

16  *Plaintiff's Physicians*

17  Plaintiff was treated by Dr. Jeffrey Haggenjos, D.O., from March 1998 until October

18  2003. (TR. 155-184, 402-499, 554-568). Dr. Haggenjos diagnosed Plaintiff with, *inter alia,*

19  depression, hypothyroidism, obesity, asthma, fibromyalgia, sleep apnea, and degenerative

20  arthritis. (TR. 156, 406, 470, 554). The record contains an extensive number of treatment

21  notes from the doctor. (TR. 155-184. 402-499, 554-568).

22  Dr. Haggenjos's notes contain a letter from the doctor[3] in which the doctor explains

23  that Plaintiff's hypothyroid condition makes it difficult for her to lose weight and her

24  fibromyalgia limits her ability to exercise. (TR. 160). In July of 1999, Dr. Haggenjos

25  indicated that Plaintiff had complained of lumbar and cervical spinal pain, and joint pain in

26

27         [3]The letter is addressed "To Whom It May Concern," not to a particular individual or

28  agency. (TR. 160).

1  knee for three years. (TR. 174). He also indicated that this pain had persisted despite therapy

2  for two years. (TR. 175). The doctor also reported that Plaintiff suffered a loss of both fine

3  and gross dexterity. (TR. 176).

4        In April 2002, Dr. Haggenjos reported that despite prescribed therapy and treatment,

5  Plaintiff was still depressed. (TR. 417). His notes indicate that Plaintiff is unable to work.

6  (*Id.*). The doctor also wrote a letter dated April 8, 2002, which stated that he had been

7  treating Plaintiff for the past five years for "depression, low-thyroid, obesity, arthritis,

8  asthma, allergies, and sleep apnea." (TR. 423). The letter further indicated that Plaintiff is

9  unable to seek full or part-time gainful employment. (*Id.*).

10        In September 2002, Dr. Haggenjos reported that Plaintiff had a flat affect and poor

11  cognitive status. (TR. 405). He indicated that Plaintiff's mental conditions had persisted for

12  five years and had responded poorly to treatment. (TR. 406). He also found that Plaintiff's

13  ability to tolerate stress was poor. (*Id.*).

14        Dr. Haggenjos noted that Plaintiff had been compliant with her treatment and that

15  Plaintiff had followed through with his referral to a mental health specialist. (TR. 177, 404,

16  180). The doctor noted that with the exception of Dr. Stainbrook Plaintiff had been

17  complaint with medication and appointments. (TR. 406).

18        Dr. Haggenjos also referred Plaintiff to a number of specialist. He referred Plaintiff

19  to George Waylonis, M.D., director of Emeritus Physical Medicine & Rehabilitation; David

20  G. Stainbrook, Jr., D.O., certified rheumatoloist; Roger Balogh, M.D., certified sleep

21  specialist; Mark Scott, D.P.M., podiatrist; and Michael Franz, M.D., an allergy specialist.

22        In February 2000, Plaintiff was seen by Dr. Micheal Franz who diagnosed Plaintiff

23  with asthma and allergic rhinitis with sinus headache. (TR. 355). He recommended that

24  Plaintiff use environmental controls, avoid animals and tobacco smoke, and continue use of

25  symptomatic medications as needed. (TR. 355). Plaintiff was also seen in 1998 by Dr.

26  Burton Moss, an allergy specialist. He diagnosed Plaintiff with perennial allergic/non-

27  allergic rhinitis and asthma with both allergic and non-allergic triggers. (TR. 110). He also

28

1  noted that Plaintiff had suffered from frequent upper respiratory symptoms with no trend
2  toward improvement. (TR. 109). Dr. Moss did not feel that Plaintiff had been compliant with
3  the prescribed therapy. (Tr. 99).

4        Dr. Haggenjos referred Plaintiff to two separate doctors for evaluation of her possible
5  fibromyalgia. Plaintiff was seen by Dr. George Waylonis in August 1999. (TR. 130-135).
6  Dr. Waylonis did not find any of the possible 18 tender points and could not support a
7  diagnosis of fibromyalgia. (TR. 135). In August 2002, Plaintiff was seen by Dr. David
8  Stainbrook, a board certified rhuematologist. (TR. 398-401). In his initial letter to Dr.
9  Haggenjos, Dr. Stainbrook indicated that Plaintiff had 16 out of 18 fibromyalgia tender
10  points. (TR. 400). Dr. Stainbrook found that Plaintiff had diffuse arthralgias and myalgias
11  consistent with fibromylagia syndrome. (*Id.*). Dr. Stainbrook requested that blood work and
12  x-rays be obtained on Plaintiff. (TR. 398, 401). The doctor reevaluated Plaintiff in
13  September after the blood work and x-rays had been obtained. (TR. 398). At that time the
14  doctor diagnosed Plaintiff with fibromyalgia syndrome; degenerative disc disease and
15  osteoarthritis of the cervical and lumbar spine; osteoarthritis of the knees and hands; bilateral
16  trochanteric bursitis; thoracic muscular pain; bilateral biciptial tendonitis; subacromial
17  bursitis; hypothyroidism; osteoarthritis of the feet; and positive ANA. (*Id.*).

18        Plaintiff was seen by Dr. Mark Scott in March of 2000. (TR. 353-54). Dr. Scott
19  diagnosed Plaintiff with HAV deformity of the right foot and peroneal sublaxation of the
20  right ankle. (TR. 354). He also noted that "there is no gross dislocation laterally beyond the
21  fibula...no degenerative arthritic changes noted." (*Id.*)

22        Dr. Haggenjos referred Plaintiff to Dr. Roger Balogh at Genesis Health Care System
23  Sleep Disorders Center. (TR. 513-24). Dr. Balogh diagnosed Plaintiff with clinically
24  significant obstructive sleep apnea syndrome. (TR. 516, 518, 520). He recommended that
25  Plaintiff use the CPAP machine at home when sleeping. (TR. 518). He noted a good initial
26  response to the CPAP. (TR. 518, 516, 515). The doctor also noted that Plaintiff "is
27  struggling with some panicky feelings...Around 5 A.M. sh has to take it off..." (TR. 516).

28

1  He further noted that while Plaintiff's energy level and alertness were better, they were still
2  not significantly better. (*Id.*)

3        Plaintiff was also seen by Six County, Inc., a private, behavioral heal care corporation.
4  (TR. 125-129, 377-397).   Plaintiff was diagnosed with depressive disorder and mood
5  disorder. (TR. 128, 397, 381, 389).   On June 13, 2002, the counselor noted that Plaintiff
6  moved from one topic to another, "had difficulty focusing and had a tendency to ramble."
7  (TR. 386).   On April 22, 2002, the counselor noted that Plaintiff was in a "depressed mood
8  with anxiety." (TR. 394).

9        After Plaintiff moved to Tucson in August 2003, she was seen by Dr. Paul Afek at the
10  Three Points Clinic. (TR. 569-583).   Dr. Afek diagnosed Plaintiff with hypothyroidism,
11  obesity, allergic rhinitis, and bipolar disorder. (TR. 569).   Plaintiff also began treatment at
12  La Frontera. (TR. 525-547, 548-553, 591-593).   Plaintiff was diagnosed with bipolar disorder
13  and obsessive compulsive personality disorder. (TR. 545, 550).   During her treatment at La
14  Frontera, Plaintiff was seen by counselors as well as Bruce Roberts, M.D. Dr. Roberts was
15  asked to perform a Mental Residual Functional Capacity Assessment. (TR 550-554).   The
16  doctor indicated that Plaintiff had been diagnosed with bipolar disorder and mild obsessive
17  compulsive disorder. (TR. 550, 551).   However, the doctor remarked that he had not yet done
18  a full psychological assessment "let alone a functional capacity assessment." (TR. 551-52).
19  He further commented that he was unable to assess Plaintiff's response to medication or to
20  determine anticipated length of disability. (TR. 552).

21        *State-Agency Consultative and Non-Examining Physicians*

22        Plaintiff was seen by consultative examiner Margaret G. Smith, Ph.D., on September
23  1, 1999. (TR. 137-44).   Dr. Smith diagnosed Plaintiff with dysthymic disorder. (TR. 143).
24  However, the doctor found that Plaintiff had normal range intellectual functioning and should
25  be able to understand and execute simple instructions within the simple, moderate and low
26  complex task ranges. (TR. 144).   With respect to Plaintiff's ability to maintain appropriate
27  concentration and attention, Dr. Smith found that Plaintiff could perform at least within the
28

1    simple to moderate task range. (*Id.*).  Dr. Smith also felt that Plaintiff would be able to
2    interact with co-workes, supervisors and the public and that Plaintiff would be able to handle
3    work stressors. (*Id.*).

4           An Assessment of Ability to Work was performed by Roy Shapiro, Ph.D. (TR. 145-
5    54). Dr. Shapiro did not find Plaintiff's impairments to be severe. (TR. 146). He did find her
6    to be suffering from affective disorder. (*Id.*). He only found slight restrictions on Plaintiff's
7    activities of daily living and slight limitation regarding maintaining social functioning. (TR.
8    153). Carole Rosanova, M.D., also completed a consultative evaluation of Plaintiff's
9    condition. (TR. 185-88). "[T]he evidence supports a MRFC for at least simple work
10   activities..." (TR. 185).

11          Charles Loomis, a licensed psychologist, also conducted a consultative exam of
12   Plaintiff. (TR. 363-67). He assessed Plaintiff as suffering from anxiety disorder. (TR. 366).
13   He also found that her ability to relate to others was not significantly impaired. (TR. 367).
14   He also determined that there did not appear to be any impairment of Plaintiff's ability to
15   understand, remember and follow basic instructions. (*Id.*). Loomis determined that Plaintiff's
16   "ability to cope with the ordinary stresses and pressures of competitive work would appear
17   to be mildly to moderately limited given her symptoms of anxiety and depression." (*Id.*).
18   Robert Gaffey, Ph.D., also performed a consultative examination of Plaintiff. (TR. 500-512).
19   Dr. Gaffey found that Plaintiff suffered from anxiety-related disorder but that the impairment
20   was not severe. (TR. 500). He found that Plaintiff's degree of limitation would be mild with
21   respect to restrictions of daily activities, difficulties in maintaining social functioning, and
22   difficulties in maintaining concentration, persistence and pace. (TR. 510).

23          A consultative examination of Plaintiff was conducted by William Padamadan, M.D.
24   (TR. 368-76). His final diagnosis of Plaintiff was that she suffered from nerves and
25   depression which Plaintiff was attending counseling for; arthritis "without any clinical
26   evidence of inflammatory arthritis or osteoarthritis, except for passive crackling of the
27   knees...;" and mild and intermittent asthma. (TR. 371). Dr. Padamadan indicated that
28

- 9 -

because of her asthma, Plaintiff may need restrictions for exposure to chemicals, fumes and dust. (*Id.*). He also noted that Plaintiff may not be able to kneel or crawl due to the problems with her knee and her weight. (*Id.*). He noted mild degenerative changes in Plaintiff's left hip. (TR. 376). A consultative examination was also performed by Robert Thompson, M.D. (TR. 189-95). Dr. Thompson found no joint abnormalities and diagnosed Plaintiff with diffuse myalgias and arthralgias. (TR. 190, 191).

CLAIM EVALUATION

Disability claims are evaluated pursuant to a five-step sequential process. 20 C.F.R. §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled under the Act and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c).

In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities. *Id.* If the ALJ concludes that the impairment is not severe, the claim is denied. *Id.* Upon a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary. If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.

1    The fourth step requires the ALJ to consider whether the claimant has sufficient

2  residual functional capacity ("RFC")[4] to perform past work.   20 C.F.R. §§ 404.1520(e),

3  416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the

4  claim is denied.  *Id*.  However, if the claimant cannot perform any past work due to a severe

5  impairment, then the ALJ must move to the fifth step, which requires consideration of the

6  claimant's RFC to perform other substantial gainful work in the national economy in view

7  of claimant's age, education, and work experience.  20 C.F.R. §§ 404.1520(f). 416.920(f).

8    At step five, in determining whether the claimant retained the ability to perform other

9  work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the

10 SSA. *Desrosiers,* 846 F.2d at 576-577.  The grids are a valid basis for denying claims where

11 they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461

12 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength

13 factors, where the claimant has significant nonexertional limitations, the grids do not apply.

14 *Penny,* 2 F.3d at 958-959; *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998).  Where the

15 grids do not apply,  the ALJ must use a vocational expert in making a determination at step

16 five. *Desrosiers,* 846 F.2d at 580.

17 THE ALJ'S FINDINGS

18    In the instant case, the ALJ made the following findings:

19    1.    The claimant meets the nondisability requirements for a
20          period of disability and Disability Insurance Benefits set
              forth in Section 216(j) of the Social Security Act and is
              insured for benefits through December 31, 2001.
21

22    2.    The claimant has not engaged in substantial gainful
              activity since the alleged onset of disability.  Any work
              thereafter was un [sic] unsuccessful work attempt.
23

24    3.    The claimant's obesity, anxiety disorder, not otherwise
              specified, arthritis, sleep apnea and hypothyroidism,
25          asthma and fibromyalgia are considered "severe" based
              on the requirements in the Regulations 20 CFR. §§
              404.1520(c) and 416.920(b).
26

27    [4]Residual functional capacity is defined as that which an individual can still do despite
28 her limitations. 20 C.F.R. § 404.1545.

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The claimant has the following residual functional capacity: light work as defined in the Regulations. The claimant is precluded from concentrated exposure to dust, fumes and gases and from kneeling and crawling. She is limited to simple, unskilled work.

7.   The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8.   The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9.   The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

10.   Due to claimant's age, transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11.   The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12.   Based on an exertional capacity for light work, and the claimant's age, education, and work experience, using Medical-Vocational Rules 201.20 and 201.21, Appendix 2, Subpart P, Regulations No. 4 as framework for decision making would direct a conclusion of "not disabled."

13.   The claimant was not under a "disability,"as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(TR. 26-27).

ARGUMENT

Plaintiff's Motion for Summary Judgment

In her Motion for Summary Judgment, Plaintiff argues that the ALJ erred when he disregarded the opinion of Plaintiff's treating physician, Dr. Jefferey Haggenjos, without clear and convincing reasons for doing so. Plaintiff contends that the ALJ's decision to reject

- 12 -

1   the testimony of the treating physician was not supported by substantial evidence in the
2   record. Plaintiff points to diagnoses of treating specialists that support the diagnoses reached
3   by Dr. Haggenjos. (Plaintiff's Motion, Docket 13, p.7-9). Plaintiff further argues that the
4   ALJ erred by not obtaining the opinion of a vocational expert to assess Plaintiff's
5   nonexertional limitations. (*Id.* at 9-11).

6       Defendant's Cross-Motion for Summary Judgment

7       Defendant argues that the ALJ properly rejected the conclusions of the treating
8   physician because the ALJ found that the opinion of Dr. Haggenjos conflicted with other
9   medical evidence in the record. Defendant contends that the ALJ properly evaluated the
10   evidence in the record and resolved conflicts and made credibility determinations as is his
11   responsibility. (Defendant's Motion, Docket 16, p.2-5). Defendant further argues that the
12   ALJ properly applied the Grids in assessing Plaintiff's RFC because Plaintiff's nonexertional
13   limitations were not sufficiently severe to limit her functional capacity in ways not
14   anticipated by the Grids. (*Id.* at 6-7).

15   STANDARD OF REVIEW

16       Pursuant to 42 U.S.C. § 423(d)(1)(A), an insured individual is entitled to disability
17   insurance benefits if he or she demonstrates, through medically acceptable clinical or
18   laboratory standards, an inability to engage in substantial gainful activity due to a physical
19   or mental impairment that can be expected to last for a continuous period of at least twelve
20   months. The Ninth Circuit has stated that "'a claimant will be found disabled only if the
21   impairment is so severe that, considering age, education, and work experience, that person
22   cannot engage in any other kind of substantial gainful work which exists in the national
23   economy.'" *Penny v. Sullivan,* 2 F.3d 953, 956 (9th Cir. 1993) quoting *Marcia v. Sullivan,*
24   900 F.2d 172, 174 (9th Cir. 1990).

25       To establish a *prima facie* case of disability, the claimant must demonstrate an
26   inability to perform his or her former work. *Gallant v. Heckler,* 753 F.2d 1450, 1452 (9th Cir.
27   1984). Once the claimant meets that burden, the Commissioner must come forward with
28

- 13 -

1  substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d
2  1427, 1429 (9th Cir. 1985).

3       Pursuant to 42 U.S.C. §405(g), the findings of the Commissioner are conclusive and
4  courts may overturn the decision to deny benefits "only if it is not supported by substantial
5  evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9ᵗʰ Cir.
6  1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not
7  disabled must be upheld if the Commissioner applied the proper legal standards and if the
8  record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*,
9  894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers v. Secretary*, 846 F.2d 573, 575-76 (9th
10 Cir. 1988); *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is
11 defined as such relevant evidence which a reasonable mind might accept as adequate to
12 support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans
13 v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a
14 preponderance. *Matney,* 981 F.2d at 1019. A denial of Social Security benefits will be set
15 aside if the Commissioner fails to apply proper legal standards in weighing the evidence even
16 though the findings may be supported by substantial evidence. *Winans,* 853 F.2d at 644.

17      The Commissioner, not the court, is charged with the duty to weigh the evidence,
18 resolve material conflicts in the evidence and determine the case accordingly. *Id.* However,
19 when applying the substantial evidence standard, the court should not mechanically accept
20 the Commissioner's findings but should review the record critically and thoroughly. *Day v.
21 Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence
22 that supports as well as detracts from the examiner's conclusion. *Id*. at 1156. Moreover, "if
23 the evidence can support either outcome, the court may not substitute its judgment for that
24 of the ALJ." *Matney,* 981 F.2d at 1019

25      In evaluating evidence to determine whether a claimant is disabled, the opinions of
26 treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9ᵗʰ
27 Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on
28

- 14 -

1 either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving
2 a conflict between the opinion of a treating physician and that of an examining physician,
3 the opinion of the treating physician is entitled to greater weight and may be rejected only
4 on the basis of findings setting forth specific legitimate reasons based on substantial evidence
5 of record. *Magallanes,* 881 F.2d at 751. Moreover, the Commissioner may reject the
6 treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and
7 convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

8      Further, when medical reports are inconclusive, questions of credibility and resolution
9 of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d
10 at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than
11 credible must have some support in the record. *See Light v. Social Security Administration,*
12 119 F.3d 789 (9th Cir. 1997); *see also Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).
13 DISCUSSION

14      Opinion of Plaintiff's Treating Physician

15      The ALJ did not give controlling weight to the opinions of Dr. Haggenjos, the treating
16 physician. While the testimony of a treating physician is entitled to great weight, an ALJ
17 may reject it if he establishes clear and convincing reasons for doing so. *Magallanes*, 881
18 F.2d 747, 751 (9th Cir.1989). In this case the ALJ reasoned that Dr. Haggenjos's opinion was
19 without substantial support from the other evidence contained in the record. (TR. 24).
20 "Beacuse treating physicians are employed to cure and thus have a greater opportunity to
21 know and observe the patient as an individual, their opinions are given greater weight than
22 the opinions of other physicians." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir.1996). Dr.
23 Haggenjos was Plaintiff's treating physician for five years, during which time he saw Plaintiff
24 on a regular basis and referred Plaintiff to numerous specialists. The opinions of the state
25 agency examining physicians contradicted the opinions of Dr. Haggenjos. However, if the
26 treating physician's opinion is contradicted by another doctor, the ALJ may reject that
27
28

- 15 -

1  opinion only after providing specific and legitimate reasons supported by substantial
2  evidence in the record. *Lester*, 81 F,3d at 830. The ALJ has not done so in this case.

3      Evidence exists within the record to support Dr. Haggenjos's diagnoses. Plaintiff was
4  seen by numerous treating physicians specializing in various areas. Both Drs. Franz and
5  Moss found Plaintiff to suffer from asthma and allergic rhinitis. While Dr. Waylonis could
6  not confirm a diagnosis of fibromyalgia when he examined Plaintiff in 1999, Dr. Stainbrook
7  confirmed the diagnosis when he examined Plaintiff in 2002.  Dr. Stainbrook further
8  diagnosed Plaintiff with degenerative disc disease, and osteoarthritis. Plaintiff was also seen
9  by Six County, behavioral health where she was diagnosed with depressive disorder and
10  mood disorder.   Plaintiff was seen by Dr. Afek who also diagnosed Plaintiff with
11  hypothyroidism. La Frontera behavioral center diagnosed Plaintiff as suffering from bipolar
12  disorder. The diagnosis of these specialists sufficiently support rather than contradict the
13  opinion of Dr. Haggenjos.

14      In rejecting Dr. Haggenjos's opinion, the ALJ further reasoned that the doctor relied
15  heavily on Plaintiff's subjective reports and "there exist good reasons for questioning the
16  reliability of the claimant's subjective complaints." (TR. 24). An ALJ may properly disregard
17  a treating physicians opinion because it is premised on a claimant's subjective complaints,
18  which the ALJ has already properly rejected. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir.1989)
19  *citing Brawner v. Secretary of Health & Human Servs.*, 839 F.2d 432, 433-34 (9th Cir.1988);
20  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995) *citing Flaten v. Secretary of Health*
21  *and Human Services*, 44 F.3d 1453, 1463-64 (9th Cir.1995).  In those cases, the physician
22  opinions rejected by the ALJ were based either entirely or primarily on the subjective
23  complaints of the claimant rather than on objective medical evidence.

24      In the present case, both Dr. Haggenjos as well as the treating specialists provided
25  objective medical evidence supporting Plaintiff's diagnoses. Dr. Franz performed skin tests
26  on Plaintiff confirming allergies to mites, dogs, cats, alternaria, Midwest mold, grass,
27  ragweed, birch, maple, cottonwood, hickory, oak and sycamore. (TR. 355). Dr. Moss also
28

- 16 -

1    performed skin tests confirming allergies to a number of trees, weeds, and grasses as well as
2    to mites, cockroaches, cats, dogs and molds. (TR. 110). Both doctors attributed these
3    allergies to Plaintiff's asthma condition. Dr. Balough performed observation of Plaintiff in
4    a sleep clinic where tests were conducted to determine that Plaintiff suffers from obstructive
5    sleep apnea. (TR. 513-24). Dr. Stainbrook conducted blood work and x-rays which enabled
6    him to diagnose Plaintiff with fibromyalgia syndrome, degenerative disc diseased,
7    osteoarthritis of the cervical and lumbar spine, osteoarthritis of the knees, hands and feet.
8    (TR. 398-401). The diagnoses of asthma, fibromyalgia, osteoarthritis, obstructive sleep
9    apnea, and allergies are supported by objective medical evidence and cannot be rejected by
10   the ALJ because the ALJ find that Plaintiff lacks credibility.

11          Because objective medical evidence exists to support Dr. Haggenjos's opinion, this
12   Court need not address the issue of Plaintiff's credibility. However, the Court notes that the
13   Ninth Circuit has reasoned that "[r]equiring the ALJs to specify any factors discrediting a
14   claimant at the first opportunity helps to improve the performance of the ALJs by
15   discouraging them from 'reach[ing] a conclusion first, and attempt[ing] to justify it by
16   ignoring competent evidence in the record that suggests an opposite result.'" *Varney v.*
17   *Secretary*, 859 F.2d 1396, 1398 (9th Cir.1987) *citing Gallant v Heckler*, 753 F.2d 1450, 1456
18   (9th Cir.1984). This Court finds it necessary to highlight this reasoning given the ALJ's line
19   of questioning at the hearing. The ALJ questioned Plaintiff about her mother's disability
20   status, including the type of benefits received, and wether her mother had ever worked. (TR.
21   625). The ALJ also repeatedly asks Plaintiff about her marital status after she has testified
22   that she has never been married. At one point the ALJ says, "some of these doctors have a
23   lack of understanding of your marital relationship.  I note this Genesis, Dr. Roger
24   Balough...he says that you are divorced...I wonder where he got that idea." (TR. 629). Such
25   irrelevant and pointed inquiry taints the integrity of the judicial process.

26
27
28

- 17 -

1

Determination of Plaintiff's RFC

2      The ALJ erred at step five in determining the Plaintiff's RFC to perform substantial

3   gainful activity in the national economy. The ALJ's conclusion that Plaintiff "has the residual

4   functional capacity to perform a significant range of light work" (TR. 27) is not supported

5   by the evidence. The Social Security Administration classifies work as sedentary, light,

6   medium, heavy, or very heavy depending on the required physical exertions. 20 C.F.R. §

7   404.1567. Light level work is defined as follows:

8
9
10
11

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

12

20 C.F.R § 404.1567(b). There is no medical source in the record that quantifies the effect

13

of Plaintiff's physical conditions and her ability to perform work related tasks such as lifting,

14

walking, standing, pushing and pulling. As such, it is unclear to the Court how the ALJ came

15

to the conclusion that Plaintiff retained the RFC to perform light work.

16

The ALJ further erred in determine Plaintiff's RFC by failing to obtain the opinion of

17

a vocational expert. The ALJ may rely on the Medical-Vocational Guidelines (the "grids")

18

as opposed to the testimony of a vocational expert in determining RFC, if the grids accurately

19

and completely describe a claimants impairment. *Holohan v. Massanari*, 246 F.3d 1195,

20

1208 (9th Cir.2001) citing *Reddick v. Chater*, 157 F.3d 715 (9th Cir.1998). If the grids do not

21

completely and accurately describe a claimants impairments then the ALJ must hear

22

testimony from a vocational expert. *Id.* "Thus they are sufficient only when a claimant

23

suffers from exertional limitations...The functional limitations caused by anxiety, depression,

24

concentration, and memory impairments are nonexertional limitations." *Id.* Plaintiff has been

25

diagnosed with bipolar disorder, depression, and anxiety disorder, all of which are

26

nonexertional limitations.

27

28

- 18 -

1     The ALJ does not address in his findings the limitations imposed Plaintiff's mental
2   health diagnoses. The only reference to any of Plaintiff's mental health conditions in his
3   findings, is in finding three where he makes reference to Plaintiff's anxiety disorder in
4   determining that Plaintiff's conditions are not severe. (TR. 27).  In his evaluation of the
5   evidence, the ALJ indicates that he relied on the opinion of state agency examining Dr.
6   Loomis because Dr. Roberts was unable to complete a Mental RFC. (TR. 25).  The ALJ also
7   noted that there was "no evidence that the claimant has any psychiatric impairment which has
8   significantly limited her activities of daily living." (TR. 23).  However, multiple doctors
9   diagnosed Plaintiff with a variety of mental health disorders.  Dr. Loomis only assessed
10   Plaintiff as suffering from anxiety disorder and did not address the bipolar disorder or
11   obsessive compulsive disorder that Dr. Roberts diagnosed Plaintiff with.

12     Even if the ALJ did not find Plaintiff's mental health diagnosis sufficient to warrant
13   the testimony of a vocational expert, his own determination that Plaintiff is precluded from
14   concentrated exposure to dust, fumes, and gases (TR. 27) indicates that Plaintiff did suffer
15   from nonexertional limitations affecting the types of jobs available. *Kail v. Heckler*, 722 F.2d
16   1496 (9th Cir.1984).  Because the grids only address problems with strength, they could not
17   have completely and accurately described the Plaintiff's impairments and the ALJ should
18   have taken testimony from a vocational expert. This error warrants that the case be remanded
19   for further proceedings to determine Plaintiff's RFC, including testimony from a vocational
20   expert.

21     Remanded for award of benefits or for further administrative proceedings

22     "'[T]he decision whether to remand the case for additional evidence or to simply
23   award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763
24   (9th Cir.1989) *quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir.1985).  "Remand for
25   further administrative proceedings is appropriate if enhancement of the record would be
26   useful."   *Benecke,* 379 F.3d at 593 citing *Harman v. Apfel,* 211 F.3d 1172, 1178 (9th
27   Cir.2000).  Conversely, remand for an award of benefits is appropriate where:

28

1
2
3

(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

4   *Id.* (citations omitted); *see also McCartey,* 298 F.3d at 1076-1077 (remanding for award of

5   benefits where ALJ failed to consider evidence of disability in the record).  Where the test

6   is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we

7   take the relevant testimony to be established as true and remand for an award of benefits."

8   *Benecke,* 379 F.3d at 593 (citations omitted); *see also Lester,* 81 F.3d at 834 (same).

9         In determining whether to remand this case for award of benefits or for further

10  proceedings, the Court considers the errors made by the ALJ discussed above as well as the

11  findings of the ALJ not in dispute.  In the present case, the record is void of any medical

12  source quantifying Plaintiff's physical limitations.  And as discussed above, the ALJ failed

13  to obtain the testimony of a vocational expert regarding Plaintiff's nonexertional limitations.

14  Because it is unclear in what way Plaintiff is limited by both her physical and mental

15  ailments, it is necessary that this case be remanded for further development of the record.

16        On remand the ALJ shall appropriately develop the record regarding Plaintiff's RFC

17  and the effect of her nonexertional limitations on available jobs.  The ALJ shall accept as true

18  those diagnoses of Dr. Haggenjos, which are supported by the diagnoses of the treating

19  specialists.

20  RECOMMENDATION

21        For the foregoing reasons, the Magistrate Judge recommends that the District Court,

22  after its independent review, **deny** Defendant's Cross-Motion for Summary Judgment

23  (Docket 16), **grant in part** Plaintiff's Motion for Summary Judgment (Docket 13) and

24  remand this action for further proceedings.

25        Pursuant to 28 U.S.C. § 636(b), any party may file and serve written objections within

26  10 days after being served with a copy of this Report and Recommendation.  If objections

27  are not timely filed, the party's right to de novo review may be waived.  *See United States*

28

1  *v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003) (en banc), *cert. denied*, 540 U.S. 900

2  (2003). If objections are filed, the parties should direct them to the District Court by using

3  the following case number: CV 04-00537-TUC-JMR.

4       The Clerk of the Court is directed to send a copy of this Report and Recommendation

5  to all parties.

6       DATED this 29th day of September, 2006.

7

8                                        _____

9                                            Charles R. Pyle
                                          United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28